IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION

| | |
|---|---|
| OHIO VALLEY ENVIRONMENTAL COALITION, COAL RIVER MOUNTAIN WATCH, WEST VIRGINIA HIGHLANDS CONSERVANCY, and THE SIERRA CLUB, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES ARMY CORPS OF ENGINEERS, ROBERT L. VAN ANTWERP, Commander and Chief of Engineers, U.S. Army Corps of Engineers, and DANA R. HURST, Colonel, District Engineer, U.S. Army Corps of Engineers, Huntington District, <br><br> Defendants. | ) ) ) ) ) ) ) ) Civil Action No. 3:08-0979 ) ) ) ) ) ) ) ) ) ) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1. This action challenges the U.S. Army Corps of Engineers' (the Corps') failure to comply with § 404 of the Clean Water Act (CWA), 33 U.S.C. § 1344, and the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq., relating to the issuance of a permit for a large surface coal mine in West Virginia. In particular, on August 1, 2008, the Corps issued a § 404 permit to Hobet Mining, LLC to place dredged and fill material into about 22,242 linear feet of the headwaters of Berry Branch of the Mud River near Spurlockville in Lincoln County, West Virginia in conjunction with surface mining activities for Hobet's Surface Mine No. 22. The Corps' issuance of this permit violates the CWA and NEPA and is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law in violation of the Administrative Procedure Act (APA), 5 U.S.C. §§ 553, 706(2)(A).

2. Plaintiffs claim that this permit violates the CWA and NEPA for some of the same

reasons as did the earlier § 404 permits that have been invalidated or enjoined by this Court in the related case of <u>OVEC v. U.S. Army Corps of Engineers</u>, Civil Nos. 3:05-0784 and 3:06-0438.  The Corps has also violated its duty under NEPA to involve the public in its environmental review process for this and other mines.

3.  Plaintiffs ask the Court to (1) declare that the Corps has violated its statutory duties under the CWA, NEPA, and the APA; (2) order the Corps to suspend or revoke the Hobet permit identified above, and (3) enjoin the Corps from authorizing any further mining activities at the Hobet site until the Corps complies with the CWA and NEPA, and (4) award to the Plaintiffs their costs and expenses, including reasonable attorneys' fees.

## JURISDICTION AND VENUE

4.  This action arises under the CWA and the APA.  The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1361, 2201 and 2202.

5.  Venue is appropriate in this judicial district pursuant to 28 U.S.C. § 1391(e) because Defendant Hurst and Plaintiff OVEC reside in this District and Defendant Hurst issued the Hobet permit in this District.

## PARTIES

6.  Defendant U.S. Army Corps of Engineers is the federal agency charged with administering permits under § 404 of the CWA for discharge of dredged or fill material into waters of the U.S.  The Corps is headquartered in Washington, D.C., and has a District Office in Huntington, West Virginia, where a significant portion of the actions and omissions alleged in this Complaint occurred.

7. Defendant Lieutenant General Robert L. Van Antwerp is the Chief of Engineers and Commander of the U.S. Army Corps of Engineers. He is charged with the supervision and management of all Corps decisions and actions, including the issuance and public availability of Corps permits and NWP authorizations under § 404 of the CWA, which are the subject of this lawsuit.

8. Defendant Colonel Dana R. Hurst is the District Engineer for the Huntington District office of the U.S. Army Corps of Engineers in Huntington, West Virginia. The Huntington District office is responsible for issuing permits and NWP authorizations for discharges of dredged and fill material into waters of the United States in West Virginia under § 404 of the CWA.

9. Plaintiff Ohio Valley Environmental Coalition (OVEC) is a nonprofit organization incorporated in Ohio. Its principal place of business is in Huntington, West Virginia. Most of OVEC's approximately 1,000 members reside in West Virginia, Kentucky, and Ohio, with other members located in Indiana, Washington, D.C., New York, North Carolina, Pennsylvania, Tennessee and Virginia. Its mission is to organize and maintain a diverse membership dedicated to the improvement and preservation of the environment through education, grassroots organizing and coalition building, leadership development and media outreach. OVEC has focused on mining issues and is a leading source of information about environmental issues related to mountaintop removal coal mining in West Virginia.

10. Plaintiff Coal River Mountain Watch is a nonprofit membership organization located in southern West Virginia with approximately 500 members, most residing in West Virginia. Its mission is to establish and maintain social, economic and environmental justice in the southern

coalfields of West Virginia, to keep communities intact and to improve the quality of life in these communities. Coal River Mountain Watch is a local leader in environmental and community issues related to the impacts of mountaintop removal coal mining.

11. Plaintiff West Virginia Highlands Conservancy (WVHC) is a nonprofit membership organization located in West Virginia. Established in 1967, WVHC is one of the state's oldest environmental advocacy organizations and for the past three decades has been a leader in citizen efforts to protect West Virginia's land and water resources from the effects of illegal coal mining. In 1998 WVHC played a key role in convincing EPA to conduct the first ever Environmental Impact Study on the effects of mountaintop removal mining and valley fills. Its headquarters is located in Charleston, West Virginia, and most of its approximately 1,800 members reside in West Virginia.

12. Plaintiff The Sierra Club is a nonprofit corporation incorporated in California, with over 750,000 members nationwide and many members who reside in West Virginia and belong to its West Virginia Chapter. The Sierra Club is dedicated to exploring, enjoying, and protecting the wild places of the Earth; to practicing and promoting the responsible use of the Earth's resources and ecosystems; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. The Sierra Club's concerns encompass the exploration, enjoyment and protection of surface waters in West Virginia.

13. Plaintiffs sue on behalf of their organizations and their members. Plaintiffs' members have suffered, and will suffer, injuries to their aesthetic, recreational, environmental and/or economic interests by Defendants' past and threatened future authorizations of stream

filling and disturbances related to mining activities in West Virginia pursuant to individual CWA § 404 permits, including the permit for Hobet Surface Mine No. 22. These activities make drastic changes to the landscape, eliminate large sections of forests, fill miles of streams, and pollute downstream waters. Plaintiffs' members live, recreate, flyover, use, and/or enjoy the natural and human environment near these areas. Their use and enjoyment of these areas is reduced by these mining activities.

14. In addition, Plaintiffs and their members have procedural rights under the CWA and NEPA to comment on the Corps' environmental review process so that the Corps properly assesses the environmental impacts of the Mine and activities to mitigate harm from it. Plaintiffs' members have environmental, recreational and aesthetic interests in the success and viability of those mitigation projects, so that the overall health and integrity of the watershed in the Mud River is preserved and maintained.

## STATUTORY AND REGULATORY BACKGROUND

15. Congress enacted the CWA to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To accomplish this goal, the CWA prohibits the discharge of any pollutant, including dredged spoil or other fill material, into navigable waters unless authorized by a permit. Id., § 1344.

16. The CWA authorizes the Secretary of the Army to issue permits, under certain circumstances, "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." Id., § 1344(a). The Secretary of the Army acts through the Chief of Engineers of the U.S. Army Corps of Engineers. Id., § 1344(d); 33 C.F.R. § 323.6(a).

17. The U.S. Environmental Protection Agency, in conjunction with the Corps, has

developed Guidelines for discharging fill material under § 404 of the CWA. 40 C.F.R. § 230.2(a). Under Corps policies, a § 404 permit "will be denied if the discharge that would be authorized by such permit would not comply with" the Guidelines. 33 C.F.R. § 320.4(a).

18. Pursuant to the Guidelines, no permits shall be issued that "will cause or contribute to significant degradation of the waters of the United States." 40 C.F.R. § 230.10(c).

19. Findings of significant degradation must be based on several factual determinations, including a determination about "the nature and degree of effect that the proposed discharge will have, both individually and cumulatively, on the structure and function of the aquatic ecosystem and organisms." Id., § 230.11(e).

20. Under the Guidelines, the Corps must adopt practicable alternatives that avoid environmental impacts of the discharge. 40 C.F.R. § 230.10(a). It must also take "appropriate and practicable steps" to "minimize potential adverse impacts of the discharge on the aquatic ecosystem." Id., § 230.10(d). A 1990 Memorandum of Agreement between the Corps and EPA interprets the Guidelines to mean that "[a]ppropriate and practicable compensatory mitigation is required for unavoidable adverse impacts which remain after all appropriate and practicable minimization has been required." EPA/Corps Memorandum of Agreement (Feb. 6, 1990), Section II (1990 MOA).

21. It is Corps policy that "[i]n determining compensatory mitigation, the functional values lost by the resource to be impacted must be considered." 1990 MOA, Section II. On May 7, 2004, the Corps issued a guidance document in which it stated that:

> The Clean Water Act, and the Corps implementing regulations and policies, requires that compensatory mitigation projects <u>replace aquatic functions</u> lost as a result of authorized activities. Ideally, stream functions lost as a result of permanent fills are replaced by compensatory mitigation projects that provide equivalent or similar stream functions within the same watershed.

"Mitigation for Impacts to Aquatic Resources from Surface Coal Mining," p. 3 (emphasis added). This guidance also states that "[t]he amount of mitigation credit should be based on an assessment procedure that identifies the amount of 'ecological lift' provided by compensatory mitigation plans. 'Ecological lift' means an <u>increase in aquatic functions</u>." <u>Id</u>. at 4 (emphasis added).

22. The Corps' significant degradation determination must be based on the "effects contributing to significant degradation considered individually or collectively." 40 C.F.R. § 230.10(c). The determinations of effects of each proposed discharge "shall include" a "determination of the cumulative effects on the aquatic ecosystem." <u>Id</u>., § 230.11 and (g). "Cumulative impacts are the changes in an aquatic ecosystem that are attributable to the collective effect of a number of individual discharges of dredged or fill material." <u>Id</u>., § 230.11(g)(1). The Guidelines warn that the cumulative effect of piecemeal changes can result in major impairment of water resources and interfere with existing aquatic ecosystems. <u>Id</u>., § 230.11(g)(2). Cumulative effects "should be predicted to the extent reasonable and practical." <u>Id</u>.

23. NEPA requires federal agencies to prepare a detailed environmental impact statement (EIS) for every major Federal action significantly affecting the quality of the human environment. 42 U.S.C. § 4332(2)(C).

24. If an EIS is prepared, it must include an analysis of direct and indirect environmental "effects" of the proposed action, including "cumulative" impacts and "cumulative actions." 40 C.F.R. §§ 1502.16, 1508.8, 1508.25(a)(2).

25. A "cumulative impact" is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable

future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." Id. Cumulative actions are actions "which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement." Id. § 1508.25(a)(2). Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment." 40 C.F.R. § 1508.27(b)(7). "Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts." Id.

26. NEPA requires that the Corps "insure the . . . scientific integrity of the discussions and analyses" in an EIS and "make explicit reference . . . to the scientific and other sources relied upon for conclusions in the statement." 40 C.F.R. § 1502.24.

27. NEPA requires give and take between an agency and members of the public. 40 C.F.R. §§ 1500.1(b) ("public scrutiny [is] essential"), 1500.2(d) (the agency must "encourage and facilitate public involvement"), 1501.4 (the agency must "involve the public, to the extent practicable, in preparing [EAs]"), 1506.6 (the agency must "make diligent efforts to involve the public" in preparing environmental documents, give "public notice of ... the availability of environmental documents so as to inform those persons ... who may be interested or affected," and "solicit appropriate information from the public."). NEPA requires that an agency give environmental information to the public and then provide an opportunity for informed comments to the agency. 40 C.F.R. §§ 1501.4, 1506.6. This process of disclosing information to the public must occur before the agency has reached its final decision on whether to go forward with the project. Id. § 1500.1(b).

**FACTS**

28. On October 26, 2006, the Corps issued a Public Notice that it was considering issuing a § 404 individual permit under the CWA to Hobet Mining, LLC for filling activities associated with its Surface Mine No. 22 in Lincoln County, West Virginia. The Notice contained two short paragraphs describing the proposed mining activities and the related stream disturbances that the Corps proposed to permit. The Notice contained no information describing the potential environmental impacts of this project, except that these activities would include mining through 34,243 linear feet of streams and constructing one in-stream sediment pond. The Notice stated that Hobet would be required to submit an analysis of alternatives, but did not describe it in any way. The Notice further stated that Hobet had not submitted a Compensatory Mitigation Plan to compensate for the impacts of its activities. Based on this information, Plaintiffs submitted timely comments objecting to the issuance of this Permit.

29. On August 1, 2008, the Corps issued an individual § 404 permit to Hobet for this Mine. The permit was accompanied by a 117-page, single-spaced Combined Decision Document and Environmental Assessment (CDD). The CDD contains forty pages describing a mitigation plan, and over fifty pages describing individual and cumulative environmental impacts. Id., pp. 16-56, 56-109.

30. The permit, in Special Condition 9, incorporates by reference Hobet's Compensatory Mitigation Plan—both the original October 2007 version and a lengthy March 2008 addendum. The original plan is over 200 pages. None of this material was described or contained in the Public Notice. The Corps made no other efforts to involve the public in its analysis of these issues before its decision was issued. The Corps concluded that the impacts of the Hobet project

would be insignificant and therefore no environmental impact statement was required. CDD, pp. 116-17.

31. The Corps criticized Plaintiffs' comments as being "very general in form" and containing "little specific content" about Hobet's project. CDD, p. 112. The Corps stated that those comments "focus on mining in general and reference information related to other projects and types of permits, rather than specifically on the proposed project." Id., App. E, p. 6. The reason the comments were so general is because Plaintiffs were commenting on a public notice that contained only two descriptive paragraphs, not a CDD that contained 117 single-spaced pages and referenced hundreds of additional pages of appendices and supporting studies that were never mentioned in that public notice. In particular, Hobet's Compensatory Mitigation Plan (CMP), which forms the linchpin of the Corps' conclusion of insignificant effects, was not submitted until October 2007, almost a year after the public comment period closed, and was further amended in March 2008. CDD, p. 19, 48.

32. As a result of not allowing public participation in the CDD development process, the CDD contains errors about existing selenium pollution in waters downstream from Hobet's Surface Mine No. 22. This mine has the potential to add selenium contamination to downstream waters because its coal seams "were identified as having selenium levels in excess of 1 mg/kg," thereby requiring special handling. CDD, p. 59. The Corps claims that "[t]he active Berry Branch [Westridge] Surface Mine [#3] (S-5002-03) does not appear to be impacting the water quality of the stream," there are no "problematic concentrations of any metals," including selenium, and "[w]ater quality data from active mining in the adjacent areas have been found to be within the acceptable limits." CDD, pp. 86, 106. In fact, the monitoring reports for the

Westridge mine and other mines in these adjacent areas show that they are discharging illegal amounts of selenium far above the permit limits. The West Virginia Department of Environmental Protection recently penalized Hobet for selenium violations at these nearby mines.

33. The Corps further claimed in the CDD that Hobet can control selenium releases from the new mine because it "would have in place its WVDEP-approved MHP [material handling plan] which would be expected to successfully prevent release of toxic materials from excavated material into the environment." CDD, App. E, p. 7. In fact, Hobet's engineering manager, Kenny Daniel, testified at a deposition in February 2008 that even though its material handling plan was in effect for a nearby mine, it was not preventing violations of permit limits for selenium. Thus, the Corps' conclusion in the CDD that there is no significant impairment in water quality in the mine area, and that Hobet's MHP would prevent any additional selenium releases, is incorrect. CDD, p. 107 and App. E, p. 7. In addition, the Corps' reliance on Hobet's MHP is irrational because (1) the MHP is not based on a full characterization of the amount and location of the selenium on the mine site; and (2) the MHP does not address the problem of selenium contamination from the coal itself when the coal is exposed and being removed from the site.

34. The Corps approved Hobet's CMP, which would try to restore, create or enhance 27,462 feet of streams on and off the mine site to offset the permanent and temporary loss of 26,690 feet of streams from mining activities. CDD, p. 19, 35-39, 49. Most the stream mitigation work would try to re-create the nearly 20,000 feet of streams that Hobet would mine through, and would elevate these streams 40 to 50 feet above their original elevations. Id. at 34.

The Corps cited no previous successful precedent for a mitigation project of this magnitude. The Corps admitted this proposed mitigation "does not eliminate the harm to the streams that are being mined-through," and "would not fully replace all functions lost in conjunction with the filling of 22,242 linear feet of waters of the United States associated with the proposed project." Id., App. E, pp. 10, 17.

35. The Corps relied primarily on its 2007 Interim Functional Assessment Approach (IFAA) "to determine if the proposed compensatory mitigation proposed . . . was sufficient to offset the unavoidable impacts to waters of the US within the project area." CDD, p. 19. This method has no scientific credibility or validity. Plaintiffs' expert, Margaret Palmer, has explained that the IFAA only looks at habitat, channel form, biodiversity and other structural factors that can be visually assessed, but does not measure critical ecological and biological functions like nutrient uptake, water purification, processing of organic material, and biological productivity. Palmer Decl., p. 5, Ex. 10 to Plts' Motion for Temporary Restraining Order. It is not "a scientifically justifiable functional assessment method." Id., p. 3. If these values of the lost stream functions are not measured in advance, it is impossible to know what is lost and how much mitigation is required to replace them. Id. at 2. Thus, the Corps does not even know what stream resources are being lost, because it does not make the assessment of stream "functions" that its regulations require before streams are buried.

36. The Hobet CDD states that the cumulative stream impacts within the upper Mud Fork watershed from the Hobet project and other past and reasonably foreseeable future projects would be 21.2% of the total stream length in that watershed. CDD, pp. 104-05, 108. Dr. Palmer states that "a level of impact >10% is widely recognized as resulting in impairment of streams

and has been shown to cause reduction in biodiversity." Palmer Decl., p. 5. The Corps had no reasoned basis for concluding that this level of cumulative impact was insignificant.

37. In the absence of a temporary restraining order, Plaintiffs believe that Hobet intends to soon begin timbering, clearing, and grubbing activities in its permit area and will, unless enjoined by this Court, continue to disturb and adversely affect land and surface water in the permit area. Because of the absence of any scientifically valid method of mitigating this harm, these actions will cause permanent and irreparable damage to the environment and to Plaintiffs' environmental, recreational, and aesthetic interests.

## CLAIMS

### Count One

38. The Corps' determination under the CWA that the Hobet Surface Mine No. 22 will not cause significant degradation of waters of the U.S. and will not violate 40 C.F.R. § 230.10(c) is illegal, arbitrary and capricious, because:

    a. The Corps has no reasoned basis or substantial evidence to assess, and has not in fact assessed, the functions of streams that are mined-through;

    b. The Corps' reliance on its Interim Functional Assessment Approach and other similar protocols is unscientific and irrational because those protocols do not provide an adequate assessment of the functions of headwater streams or the impacts of stream loss;

    c. Scientific evidence shows that eliminating substantial lengths of headwater streams constitutes a serious danger to the aquatic ecosystem and that attempts to recreate headwater streams have not been, and are not likely to be, successful;

    d. The Corps has no reasoned basis or substantial evidence to conclude that the

structures or functions of mined-through streams will be offset by attempted stream re-creation, restoration, or enhancement pursuant to Hobet's compensatory mitigation plan;

  e. The Corps cannot determine the extent of mitigation necessary to offset impacted resources because it failed to assess the streams' ecological value properly in the first place;

  f. Mined-through streams are permanently lost to the ecosystem, while under the Corps' performance standards for compensatory mitigation plans their "replacements" could be deemed successful and monitoring would cease after only ten years;

  g. The Corps has no reasoned basis or substantial evidence to conclude that the environmental effects of the Hobet Surface Mine No. 22, including the likely discharge of selenium from that mine to downstream surface waters, in combination with other mining projects, will be individually and/or cumulatively insignificant; and

  i. In assessing cumulative impacts, the Corps assumed without any reasoned analysis that the compensatory mitigation plans would eliminate all significant cumulative impacts.

39. These violations of the CWA and the APA by the Corps threaten Plaintiffs with irreparable injury for which they have no adequate remedy at law.

## Count Two

40. The Corps' Finding of No Significant Impact (FONSI) on the Hobet Surface Mine No. 22 violates NEPA and is arbitrary and capricious because the Corps failed to take a hard look at the environmental impacts of those projects in the following respects:

  a. The Corps has no reasoned basis or substantial evidence to assess, and has not

in fact assessed, the functions of streams that are mined-through;

  b. The Corps' reliance on its Interim Functional Assessment Approach and other similar protocols is unscientific and irrational because those protocols do not provide an adequate assessment of the functions of headwater streams or the impacts of stream loss;

  c. Scientific evidence shows that eliminating substantial lengths of headwater streams constitutes a serious danger to the aquatic ecosystem and that attempts to recreate headwater streams have not been, and are not likely to be, successful;

  d. The Corps has no reasoned basis or substantial evidence to conclude that the structures or functions of mined-through streams will be offset by attempted stream re-creation, restoration, or enhancement pursuant to Hobet's compensatory mitigation plan;

  e. The Corps cannot determine the extent of mitigation necessary to offset impacted resources because it failed to assess the streams' ecological value properly in the first place;

  f. Mined-through streams are permanently lost to the ecosystem, while under the Corps' performance standards for compensatory mitigation plans their "replacements" could be deemed successful and monitoring would cease after only ten years;

  g. The Corps has no reasoned basis or substantial evidence to conclude that the environmental effects of the Hobet Surface Mine No. 22, including the likely discharge of selenium from that mine to downstream surface waters, in combination with other mining projects, will be individually and/or cumulatively insignificant; and

  i. In assessing cumulative impacts, the Corps assumed without any reasoned analysis that the compensatory mitigation plans would eliminate all significant cumulative

15

impacts.

41. In addition, the Corps has violated NEPA and its implementing regulations, 40 C.F.R. §§ 1500.1(b), 1500.2(d), 1501.4, and 1506.6, by failing to provide for effective pre-decisional public involvement in preparation of the Environmental Assessment on the Hobet Surface Mine No. 22.

42. These violations of NEPA and the APA by the Corps threaten Plaintiffs with irreparable injury for which they have no adequate remedy at law.

## RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

1. Declare that the Corps' issuance of a § 404 permit for the Hobet Surface Mine No. 22 violates the CWA and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law in violation of the APA.

2. Declare that the Corps' FONSI on the Hobet Surface Mine No. 22 violates NEPA and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law in violation of the APA.

3. Declare that Defendants' failure to provide for effective pre-decisional public involvement in preparation of the Environmental Assessment on the Hobet Surface Mine No. 22 violates NEPA.

4. Declare that Defendants' issuance of a § 404 permit for the Hobet Surface Mine No. 22 violates the CWA and NEPA and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law in violation of the APA.

5. Order Defendants to immediately suspend or revoke the § 404 permit for the Hobet

Surface Mine No. 22;

  6. Vacate the § 404 permit for the Hobet Surface Mine No. 22 and enjoin Defendants from reissuing that permit unless and until they provide effective pre-decisional public involvement in preparation of the Environmental Assessment on the Hobet Surface Mine No. 22.

  7. Enjoin the Corps from authorizing further discharges of mining rock, dirt, or other fill materials into waters of the United States and riparian areas at the Hobet Surface Mine No. 22 or at off-site locations in connection with the mining operations or reclamation activities there unless and until the Corps complies with its duties under the CWA and NEPA.

  8. Award Plaintiffs their costs and expenses, including reasonable attorneys' and expert witness' fees, as authorized by 28 U.S.C. § 2412(d)(2)(A); and

  9. Grant Plaintiffs such other and further relief as this Court deems appropriate.

         Respectfully submitted,

         /s/ Joseph M. Lovett
         JOSEPH M. LOVETT (WVSB # 6926)
         DEREK O. TEANEY (WVSB # 10223)
         Appalachian Center for the Economy and the
           Environment
         P.O. Box 507
         Lewisburg, WV 24901
         (304) 645-9006

         Counsel for Plaintiffs

OF COUNSEL:

JAMES M. HECKER (DCBN # 291740)
Public Justice
1825 K Street, N.W. Suite 200
Washington, D.C. 20036
(202) 797-8600